**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

BARBARA ANN KELLY and
GREGORY BRIAN MYERS,

      Plaintiffs,

v.                                        CASE NO. 3:11cv252-MCR/EMT

REGIONS BANK,

      Defendant.

_____/

## ORDER

The husband and wife plaintiffs, Barbara Ann Kelly ("Kelly") and Gregory Brian Myers ("Meyers") (collectively "Plaintiffs"), were living in Bethesda, Maryland, when they began buying property in Florida. They started in 2002 with the purchase of a $615,000 second home in the resort area known as Watercolor (the "Watercolor House"). In 2004, Plaintiffs purchased three undeveloped coastal lots: Seaside Lot 6 for $900,000, Seaside Lot 13 for $495,000, and Watercolor Lot 3 for $1,050,000. In 2005, Plaintiffs bought another home in Naples, Florida, for $2,300,000. Between 2002 and 2005, Myers believed that the value of the properties would stay level or increase over time. By December 2009, however, Plaintiffs were having financial difficulties due to a "curtailment of income" and the "global effects of [the] financial and real estate market collapse." (Doc. 107-24). Plaintiffs are now suing one of their mortgage lenders, Defendant Regions Bank, regarding the bank's actions on a 2008 loan modification for Seaside Lot 6 and a related escrow agreement, from which payments were to be made on the loan for the Seaside Lot 6, as well as two other residential mortgage loans with Regions Bank. Regions Bank has filed a counter-claim based on Plaintiffs' non-payment on one of the loans.

## I.    BACKGROUND

Plaintiffs had three mortgage loans with Regions Bank. In March of 2004, Plaintiffs purchased Seaside Lot 6 for $900,000. To finance the purchase, they took out a three-

year $810,000 loan from Regions Bank[1] with a balloon payment of the entire principal due in March 2007.  In July 2004, Plaintiffs took out a Home Equity Line of Credit Agreement ("HELOC") with a $327,000 credit limit secured by the Water Color House.  In October 2004, Plaintiffs took out a $945,000 purchase mortgage for Watercolor Lot 3.[2]

Plaintiffs' loan on Seaside Lot 6 was modified twice at their request.  First in February 2006, Meyers sought to renew the loan for Seaside Lot 6 to postpone the balloon payment.  Regions Bank agreed to renew the loan in March 2007 and postpone the balloon payment for three years until March 2010.  The interest rate on the loan doubled to 7.99%.  In April 2008, Meyers requested another modification, this time in the form of a "cash-out modification . . . for a minimum of $315,000, with the proceeds to be placed in [his] checking account at Regions."  (Doc. 121 ¶ 37).  Regions Bank had Seaside Lot 6 appraised at $1,425,000.  Based on the appraisal, Plaintiffs and Regions Bank agreed on May 24, 2008 to the terms of a promissory note, which increased the balance on the loan to $1,068,000 with interest at 6.00%.[3]  From the loan proceeds, $810,920.10 was paid to Regions Bank to satisfy the prior loan balance on Seaside Lot 6, and $15,241.00 was applied to settlement charges.  The remaining $241,838.90 was placed in an escrow account to be administered by Regions Trust.  The funds in escrow were earmarked for the mortgage payment on the loan for Seaside Lot 6, plus payments on the HELOC and the loan on Watercolor Lot 3.  The escrow funds were also designated to pay the real estate taxes, insurance, and the home owner association assessments for Seaside Lot 6, the Watercolor House, and Watercolor Lot 3.

Regions Bank's senior credit officer, Thomas Bloetscher ("Bloetscher"), approved the cash-out refinancing based on his understanding that Myers and Kelly were facing a temporary liquidity problem instead of a more serious financial hardship, and his

[1] The loan was originally provided by AmSouth Bank, which merged with Regions Bank on November 4, 2006.  *See* http://www.regions.com/about_regions/regions_history.rf

[2] This loan had an original principal amount of $945,000. It was taken out by Kelly on October 14, 2004 and secured with a mortgage and balloon note for Watercolor Lot 3.  It was modified on October 11, 2007 with a balloon loan modification.

[3] The interest rate was reduced to 5.00% in February 2009.

understanding that Plaintiffs were actively attempting to sell at least one of their Florida properties. The cash-out funds were placed in an escrow account to ensure they would be used to make payments on Myers and Kelly's loans with Regions Bank through November 2009. This would allow them time to meet their obligations in the short term and to sell off some of their properties to reduce their financial exposure.

In March of 2009, Cynthia Villanova ("Villanova"), a vice president at Regions Bank who had been working with Myers and Kelly, contacted the bank's loss mitigation department regarding concerns she had about Myers and Kelly's ability to satisfy their loan obligations over the next several months. Villanova became concerned after Myers told her he wanted to borrow an additional $1,000,000 to cover loan payments and to build a home on Seaside Lot 6, which Myers thought would make the property more marketable. The loss mitigation department specializes in finding long-term solutions for borrowers experiencing financial hardship. The loss mitigation department sent hardship packages to Meyers, but he did not respond. On July 10, 2009, Meyers spoke with Wanda Casey, a team leader with the loss mitigation department. By that time, approximately $45,000 remained in the escrow account, which would be depleted within the next few months.

Bloetscher was concerned because Meyers stopped listing the properties for sale, requested a larger loan, and was not providing current financial information to the loss mitigation department. Bloetscher gave instructions to stop payments from the escrow account to Regions Bank in July of 2009, which Regions Bank was allowed to do under the terms of the May 24, 2008 promissory note in the event Regions Bank became insecure. The escrow funds were still available, however, to pay taxes, insurance, and fees to other entities. In late October 2009, Meyers provided financial information to Regions Bank showing that Plaintiffs had amassed over $8.6 million in real estate-related debt, which required monthly payments of more than $50,000. In November 2009, Regions Bank released the escrow funds in order to bring current all obligations that were not paid to Regions Bank between July and October 2009. By then, however, credit delinquencies had been reported automatically by Regions Bank for the period of time that the escrow payments had been suspended.

Plaintiffs have filed a six count complaint against Regions Bank. In Count One, Plaintiffs allege that Regions Bank breached the escrow agreement by failing to ensure that payments on Plaintiffs' loan were timely made. In Count Two, Plaintiffs allege that Regions Bank violated the Florida Consumer Collection Practices Act by (1) falsely reporting to credit reporting agencies that Plaintiffs were in default, (2) failing to disclose to the credit reporting agencies that Plaintiffs reasonably disputed the claim of default, (3) claiming or threatening to enforce a debt that Regions Bank knew was not legitimate, and (4) engaging in a pattern of abusive and harassing actions to collect a consumer debt. In Count Three, Plaintiffs allege that Regions Bank used an artificially inflated appraisal of Seaside Lot 6 to fraudulently induce them to refinance in 2008. In Count Four, Plaintiffs allege that Regions bank established a fiduciary relationship as Plaintiffs' financial and investment advisor and breached that relationship in connection with the administration and servicing of their loans with Regions Bank. In Count Five, Plaintiffs allege that Regions Bank engaged in constructive fraud and fraudulent misrepresentation by convincing Plaintiffs to refinance Seaside Lot 6 when it knew the lot's value did not justify the refinancing and knew that Plaintiffs would be unable to afford the balloon payment due on the loan. In Count Six, Plaintiffs allege that Regions Bank engaged in negligent misrepresentation based on the same conduct alleged in Count Five.

Regions Bank has filed a two-count counterclaim regarding the $327,200 HELOC. Count One makes a claim for "Account Stated," and Count Two a claim for breach of contract based on Plaintiffs' default of their payment obligations. On cross motions, Regions Bank seeks final summary judgment in its favor on all of Plaintiffs' claims and on Count Two of its counterclaim, and Plaintiffs seek partial summary judgment limited to Count One of their complaint.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Pursuant to Rule 56, summary judgment is warranted "after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). When assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Moreover, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Group, Ltd.*, 432 F. App'x. 867, 869-70 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 249-50).

## III.    DISCUSSION

### A.    Count One–Breach of Contract

Plaintiffs allege in Count One that Regions Bank breached the escrow agreement when it refused to make the mortgage and HELOC payments due in July, August, September, and October of 2009, even though there was sufficient money in the escrow account to do so. Under Alabama law, which governs the escrow agreement,[4] an escrow

---

[4] The escrow agreement contains a choice of law provision providing that the agreement "shall be governed and construed in accordance with the laws of the State of Alabama."  (Doc. 112-8 ¶ 19).

agent is "akin to a special agent and is limited in its liability to the proper performance of those duties and obligations specifically delineated in the escrow agreement and the specific goal." *Gurley v. Bank of Huntsville*, 349 So. 2d 43, 45 (Ala. 1977). Moreover, "[t]he escrow instructions constitute the full measure of the agents's obligations and any other matters which arise in the transaction are collateral to the specific objectives of the escrow agreement." *Id.*

The escrow agreement in this case provides:

> The Escrow Agent shall release the Escrow Funds as authorized by the Secured Party and only in accordance with the instructions as set forth in "Exhibit A," or as otherwise expressly set forth in this Agreement.

(Doc. 112-8 ¶ 3).

Exhibit A to the Escrow Agreement provides as follows:

> • Escrow Agent shall pay funds according to the following schedule as directed by the secured party:
> • Monthly mortgage payments on Lot 6 Seaside to Regions Bank.
> • Monthly mortgage payments on Lot 3 Watercolor to Regions Bank.
> • Monthly Home Equity Line of Credit payment on 147 Silver Laurel Way [Watercolor House] to Regions Bank.
> • Real Estate taxes due on Lot 6 Seaside, Lot 3 Watercolor and 147 Silver Laurel Way [Watercolor House] to the Walton County Tax Collector.
> • Home owner's insurance due on 147 Silver Laurel Way [Watercolor House].
> • Home Owner's Association dues on Lot 6 Seaside, Lot 3 Watercolor and 147 Silver Laurel Way [Watercolor House].

(Doc. 112-8 Ex. A). The escrow agreement further provides:

> Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Agreement. The Escrow Agent may rely upon any written instructions believed in good faith to be genuine when signed and presented by the requesting party and shall not have the duty to inquire or investigate the validity truth and/or accuracy of any such written instruction. . . . [S]hould the Escrow Agent become uncertain as to its duties under this

> Agreement, it shall be permitted to (a) immediately suspend the performance of any obligations (including without limitation any disbursement obligations) under this Agreement until such uncertainty shall be resolved to the sole satisfaction of Escrow Agent . . . . Escrow Agent shall have no liability to Depositor, Secured Party, . . . or any other person with respect to any such suspension of performance . . . specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds . . . .

(Doc. 112-8 ¶ 6 (emphasis added)).  The agreement further limits the liability of the escrow agent as follows:

> The Escrow Agent shall not be liable for any action taken or omitted by it in good faith . . . except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to the Depositor or Secured Party. . . . In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including but not limited to lost profits) . . . .

(Doc. 112-8 ¶ 5 (emphasis added)).

Given the clear terms of the escrow agreement and the undisputed facts, Plaintiffs cannot maintain a claim against Regions Bank for suspending the escrow payments for July, August, September, and October of 2009.  The escrow agreement expressly states that the escrow agent has "no liability . . . [for] suspension of performance" and gives the escrow agent the authority to resolve to its "sole satisfaction" any uncertainty as to its duties under the escrow agreement.  Furthermore, the escrow agreement provides that no liability against the escrow agent will hold unless the escrow agent acted with "gross negligence or willful misconduct."  Plaintiffs do not even attempt to argue that Regions Bank's conduct violated this standard, and indeed they could not given the facts of this case.  There are no facts in the record suggesting that Regions Bank acted with gross negligence or willful misconduct in either of its roles.  Regions Bank directed the escrow payments to stop when it became concerned in its role as the secured party about Plaintiffs' ability to repay their loan obligations.  After Plaintiffs provided updated financial

information, Regions Bank as the escrow agent released the funds as instructed. The temporary suspension of the escrow payments does not constitute a breach of the terms of the escrow agreement. Although Plaintiffs complain that Regions Bank should not be able to act as both the secured party and the escrow agent, Plaintiffs knew from the terms of their contract that Regions Bank would act as both. Based on the foregoing, Regions Bank is entitled to summary judgment on Count One.

### B.       Count Four–Breach of Fiduciary Duty[5]

In Count Four, Plaintiffs allege that Regions Bank Vice President Cynthia Villanova acted as their financial advisor with a formal fiduciary duty to them with respect to their real estate, banking, and investment dealings. Plaintiffs allege that Regions Bank breached its fiduciary duty by inducing Plaintiffs to accept the 2008 cash-out refinancing, failing to disclose facts material to the loan transaction, and failing to property administer and service the loan.

Under Florida law, which governs this claim,[6] "[g]enerally, the relationship between a bank and its borrower is that of creditor to debtor, in which the parties engage in arms-length transactions, and the bank owes no fiduciary responsibilities." *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994). A fiduciary relationship may arise, however, if a bank has reason to know that the customer is placing his trust and confidence in the bank and relying on the bank to inform him. *Id.* at 519. A fiduciary relationship may also arise from "special circumstances," such as the bank's conduct of providing extra services, engaging in transactions that provide greater economic benefit to the bank than the typical transaction, and exercising "extensive control." *Id.* The issue of whether a fiduciary relationship has arisen is fact specific, requiring consideration of circumstances surrounding the transaction and the relationship of the parties to determine whether the customer had reason to place special trust and reliance in the bank to advise and inform and whether the bank had reason to know of that reliance. *Id.* at 518.

---

[5] The court addresses Plaintiffs' claims in the order in which they appear in Regions Bank's motion for summary judgment. Counts Two and Three are addressed in later sections of this order.

[6] As noted in a previous Order (doc. 75 n.6), Florida law governs the tort claims, and Plaintiffs have not argued otherwise.

Case No. 3:11cv252-MCR/EMT

To support their claim that a fiduciary duty arose from Plaintiffs' interactions with Villanova, Plaintiffs note that Regions Bank marketed Villanova as someone who had access to "unlimited resources," would be a private banking client's "one point of contact" with Regions Bank, would be "focused on building, managing and preserving [a private banking client's] wealth," and could connect a private banking client with "investment management," credit management," "trust services," and "traditional banking." (Doc. 120-13, Regions Bank's marketing materials). According to Meyers, he trusted and relied on Villanova and had total confidence that she was acting in his family's best interests. Meyers considered Villanova to be his financial and investment advisor, as well as his private banker and wealth manager, after he deposited $50,000 into his private client services account. Meyers states that he talked to Villanova about every single Florida real estate investment and every single refinancing decision. Meyers also notes that the cash-out refinancing that Villanova was able to arrange for him had not been used with any other Regions Bank customer.

Regions Bank argues that the undisputed facts, including Plaintiffs' extensive experience in the real estate and mortgage business and their relationship with Villanova, belie any claim that the Plaintiffs' asserted reliance on Villanova rose to a fiduciary relationship. The court agrees. First, the undisputed record shows that Meyers worked in commercial real estate development from 1983 to 1991. In 1991, Myers began working as a residential mortgage loan originator and became licensed to perform those services in the State of Maryland. Kelly worked as a marketing director for a real estate company in 1990. In 1995, she opened MetFund Mortgage Services (MetFund), a residential mortgage origination business. Kelly was MetFund's president and sole owner. Myers worked for MetFund from 1996 to 2008 as its only loan originator, and was executive vice president. Myers reported to Regions Bank that his income from MetFund in 2006 was $450,000. In 2006, MetFund applied to do business in Florida as a foreign corporation. In 2007, MetFund obtained a license from the State of Florida for a mortgage brokerage business. In 2007, Myers obtained his personal Florida mortgage brokerage license, but MetFund effectively closed at the end of 2007 when business declined as a result of the collapse of the housing market. From 2006 through 2008, Myers traded securities through

Charles Schwab accounts at annual volumes well in excess of $10,000,000. In 2008, Myers began working as an investment advisor representative himself for Convergent Wealth Advisors, an investment advisory firm whose clients are affluent individuals and families.

Additionally, the undisputed facts establish that Myers and Kelly's interactions with Villanova are not indicative of a fiduciary relationship. Plaintiffs bought the Watercolor House in 2002 before meeting Villanova and they did not obtain financing for the purchase through Regions Bank. In January 2004, when Plaintiffs signed the purchase and sale agreement for Seaside Lot 6, they had never met Villanova. Only after signing the purchase and sale agreement did Meyers initiate contact with Villanova. He sent her a letter inquiring about financing for Seaside Lot 6, and he identified Wachovia and SunTrust as competing lenders. In June of 2005, Plaintiffs purchased the home in Naples, Florida for $2,300,000. Plaintiffs found the property without Villanova's assistance and did not obtain financing through Regions Bank. In February 2006, it was Meyers who initiated the refinancing of Seaside Lot 6 to postpone the balloon payment. Plaintiffs later listed the property for sale in June 2007 for $1,995,000. again without Villanova's advice. In April 2008, Meyers initiated the second refinancing on Seaside Lot 6, and it was he who suggested the novel cash-out proposal, not Villanova. Villanova did not advise Meyers regarding his Charles Schwab accounts or his accounts with other banks. His wife Kelly never even spoke to Villanova. Meyers identified only one account on which Villanova was advising him—his private client services account that he opened with an initial deposit of $50,000 in 2004. In February of 2006, the account balance was approximately $16,000, and by 2008, the account contained only $585. Meyers has not identified any specific investment advice that Villanova gave him with respect to that account. Moreover, the account was a no-fee account, no different than the accounts Villanoava made available to her 700 other private banking clients.

A jury evaluating this undisputed evidence could not reasonably conclude that the circumstances were sufficient to give rise to the existence of a fiduciary relationship between Regions Bank and Plaintiffs. Villanova did not provide special services to Plaintiffs or exercise control of their financial decisions so as to give rise to a fiduciary

relationship. Regions Bank had no reason to know that Plaintiffs had placed trust in and relied on Villanova beyond her ordinary role as an agent for Regions Bank. Accordingly, Regions Bank is entitled to judgment as a matter of law on Count Four.

### C.    Counts Three, Five, and Six–Fraud and Misrepresentation

In Count Three, Plaintiffs allege that Regions Bank used an artificially inflated appraisal of Seaside Lot 6 to fraudulently induce them to refinance in 2008. In Count Five, Plaintiffs allege that Regions Bank engaged in constructive fraud[7] and fraudulent misrepresentation by convincing Plaintiffs to refinance Seaside Lot 6 when they knew the lot's value did not justify the refinancing and knew that Plaintiffs would be unable to afford the balloon payment due on the loan. In Count Six, Plaintiffs allege that Regions Bank engaged in negligent misrepresentation based on the same actions alleged in Count Five.

The elements for these three claims are similar. To prove a claim of fraudulent inducement, Plaintiffs must show: (1) that the defendant made a statement concerning a material fact, (2) with knowledge that the statement was false, (3) with intent to induce the plaintiffs to act on the false statement, and (4) the plaintiffs were damaged because they reasonably relied on the false statement. *Gemini Investors III, L.P. v. Nunez*, 78 So. 3d 94, 97 (Fla. 3d DCA 2012); *see also Rose v. ADT Sec. Servs., Inc.*, 989 So. 2d 1244, 1247 (Fla. 1st DCA 2008). To state a claim for fraudulent misrepresentation, Plaintiffs must prove "(1) a false statement concerning a material fact; (2) the representer's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury [to] the party acting in reliance on the representation." *Specialty Marine & Indust. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310 (Fla. 1st DCA 2011) (*citing Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)). The same elements are required for a claim of negligent misrepresentation plus an additional element of justified reliance under a reasonable person standard. *Butler*, 44 So. 3d at 105 (stating the plaintiff is

---

[7] "Constructive fraud occurs 'when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Am. Honda Motor Co. v. Motorcycle Information Network, Inc.*, 390 F.Supp. 2d 1170, 1179 (M.D. Fla. 2005) (*quoting Levy v. Levy*, 862 So. 2d 48, 53 (Fla. 3d DCA 2003)). A constructive fraud claim will not lie without acceptance or undertaking of a fiduciary duty by the defendant. *Id.* Because no fiduciary duty has arisen in this case, the plaintiffs' constructive fraud claim fails. *Id.*, *see also Servicios de Almacen Fiscal Zona Franca Mandatos, S.A. v. Ryder Int'l*, 264 F. App'x 878, 881 (11th Cir. 2008).

responsible for investigating information that a reasonable person in his position would be expected to investigate).  The false statement that forms the basis for all three claims is the appraisal that Regions Bank obtained for Seaside Lot 6 in conjunction with the 2008 cash-out refinancing.

Regions Bank convincingly argues that Plaintiffs cannot show that they relied on the appraisal or that Regions Bank intended to induce them to do so.  Meyers requested the cash-out refinance before the appraisal was obtained and he did not see the appraisal until after the cash-out refinance was completed.  Thus, his actions were not affected by the appraisal.  Furthermore, the purpose of the appraisal was to protect the interests of Regions Bank in extending the loan.  The court agrees with the general rule, recognized in *Nymark v. Heart Fed. Sav. & Loan Ass'n,* 283 Cal. Rptr. 53, 57 (Cal. 3d Dist. Ct. App. 1991), that  a lender owes no duty of care to its borrower in appraising the borrower's collateral to determine if it is adequate security for the loan.  "[A] financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." *Id.*  This rule is consistent with Florida law, which imposes no duty upon a bank in an arms length transaction to act for the benefit or protection of the borrower or to disclose facts that the borrower could discover by due diligence. *Barnett Bank of W. Fla. v. Hooper*, 498 So. 2d 923, 925 (Fla. 1986).  Because the appraisal in this case was obtained within the scope of Regions Bank's role as a lender, not as a fiduciary, Plaintiffs cannot sustain a claim against Regions Bank based on the appraisal.  Accordingly, Regions Bank is entitled to summary judgment on Counts Three, Five, and Six.

**D.    Count Two–Florida Consumer Protection Practices Act**

In Count Two, Plaintiffs allege that Regions Bank violated the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.72(9), by (1) falsely reporting to credit reporting agencies that Plaintiffs were in default, (2) failing to disclose to the credit reporting agencies that Plaintiffs reasonably disputed the claim of default, (3) claiming or threatening to enforce a debt that Regions Bank knew was not legitimate, and (4) engaging in a pattern of abusive and harassing actions to collect a consumer debt.  Chapter 559 defines a "debt" or "consumer debt" as "any obligation of a consumer to pay money arising

out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." Fla. Stat. § 559.55(1).

There are no Florida cases explaining the meaning of the language "primarily for personal, family, or household purposes" under the FCCPA. However, identical language in the Truth in Lending Act ("TILA") provides some guidance. The TILA applies to consumer credit transactions, which are "primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h). Credit transactions that are primarily for business, commercial, or agricultural purposes are excluded from this definition. *Smith v. Russelville Prod. Credit Ass'n*, 777 F.2d 1544, 1549 (11th Cir. 1985). Also, credit transactions for real estate investments are deemed to be for business or commercial purposes and not "primarily for personal, family, or household purposes." *Samadi v. Bank of Am., N.A.*, No. CV 109-02, 2010 WL 3894448, at *7 & n.9 (S.D. Ga. Sept. 30, 2010), *aff'd*, 476 F. App'x. 819 (11th Cir. 2012).

Plaintiffs admit that Seaside Lot 6 was listed for sale in 2007 and 2008, and was listed when the loan for the 2008 cash-out refinancing closed. The property was also part of Plaintiffs' investment portfolio. The fact that Plaintiffs considered building a second home on Seaside Lot 6 at some point in time is not enough to make the credit transaction "primarily for personal, family, or household purposes." When the loan for Seaside Lot 6 closed, Plaintiffs had a home in Bethesda, Maryland, which was their primary residence. They also had the Watercolor house, a house in Naples, Florida, and two other lots. They requested the refinancing because they were having difficulties with the loan payments, and thus were not in a realistic position to build. The facts fail to create a genuine issue regarding whether the 2008 loan for Seaside Lot 6 was primarily for personal, family, or household purposes. Accordingly, Regions Bank is entitled to summary judgment on Count Two.

### E.      Count Two of Counterclaim–Breach of the HELOC Agreement

In Count Two of their counterclaim, Regions Bank alleges that Plaintiffs breached the HELOC agreement by defaulting on their payment obligations. Plaintiffs do not dispute that they borrowed up to the HELOC's credit limit of $327,200 and that they have not

repaid the money. They argue, however, that their contractual obligation to make HELOC payments was discharged because Regions Bank breached the escrow agreement. As decided, Plaintiffs do not have a viable claim against Regions Bank for breach of the escrow agreement.[8] Accordingly, Regions Bank is entitled to summary judgment on Count Two of its counterclaim.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment (doc. 111) is **DENIED**, and Regions Bank's Motion for Summary Judgment (doc. 106) is **GRANTED**. The Clerk is directed to enter final summary judgment in favor of Regions Bank on all of Plaintiffs' claims and on Count Two Regions Bank's counterclaim. The pending motions to exclude Plaintiffs' expert (doc. 108), strike Plaintiffs' jury demand (doc. 109), and for oral argument on the pending motions (doc. 168) are **DENIED AS MOOT**. Costs to be taxed against the Plaintiffs.

**DONE AND ORDERED** this 27th day of September, 2013.


*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[8] Even if there were a breach of the escrow agreement, it is unlikely that Plaintiffs' obligation to repay the HELOC would be discharged. According to well-established contract law, "[i]n a bilateral contract . . . unless a promisor qualifies his or her promise by a condition that the other party to the contract perform, or offer to perform, before the promisor's own promise becomes enforceable, he or she would be bound to perform if the words of the promise were considered alone regardless of the nonperformance of the counterpromise. On this assumption, each party would have a right of action on the promise of the other party, since the respective promises, in terms, contain no conditions. . . . Thus, if a party's performance of one promise is not a condition precedent to another party's performance of a different promise, the first party's nonperformance may render that party liable for damages, but it does not necessarily excuse the other party's performance of his or her promise." 14 *Williston on Contracts* § 43.1 (4th ed. 2012).

Case No. 3:11cv252-MCR/EMT